The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good afternoon. Welcome to the Fourth Circuit virtually. Our first case is LifeWise Family Financial v. Triangle Capital et al. Mr. Donovan, we'll hear from you. Good afternoon, Your Honors, and may it please the Court. I would first like to thank you for the opportunity to present our argument today, and if there are no questions at the outset, I'll begin my presentation. I'll begin with the District Court's finding. The Court found that LifeWise adequately alleged falsity and identified a plausible inference of actual knowledge, that defendants did not believe their statements regarding a more fruitful investing environment, and that the statements were of the same quality as pre-class period. Despite these findings, the Court determined that this inference was not a... Counsel, let me, let me stop you at that, at that point. I read the District Court's opinion, and I looked at the paragraphs in the complaint that are referenced by the District Court, and most of those seem to be either irrelevant or statements of opinion, so the finding of an inference with respect to material misrepresentation seems awfully weak to me. What do you say are your best allegations to show a material misrepresentation here? Well, Your Honor, I would disagree with your assertion in the first instance, respectfully. We believe that we have alleged many material omissions and misstatements in this, in this complaint. We have statements from the defendants that they were operating in a more fruitful investing environment. We have statements indicating that they were exercising caution and selectivity and investment prudence with, with the investments that they were making. We have statements that indicate that the... Well, well, tell us, tell us specifically what those allegations are, and why the statements that were made were not either believed or accurate at the time. Okay, with respect to the one that I just mentioned, which was that the market was underserved and Triangle had a competitive advantage, we believe that that statement is incorrect and false, because Triangle's own investment advisors advised the company that the market was the complete opposite, and that they were, that they needed to move away from mezzanine lending. Now, that is also buttressed further by industry opinions throughout the mezzanine lending market and the lower middle market itself. Via the BGL report and other statements from both analysts and, and others, other competitors within the market, indicating that there's too much risk in the mezzanine sector. Well, the BGL report... I'm sorry, go ahead, Judge Paul. Go ahead, you can finish, finish, Judge Agee. I'll follow up. The BGL report seems somewhat dubious. I mean, it is what you posit, I guess, is expert evidence. But that report seems to be, at best, very mixed. At 221 of the joint appendix, the report says that the traditional middle market remained relatively stable. The lower middle market has experienced little disruption. A fairly resilient flow of the lower middle market. And as you go through that, there are a number of other statements. Despite the growing popularity of the Unitron's market, sponsors like the patient capital that mezzanine offers. Even with respect to credit quality, page 238, it says the trends in revenue and EBITDA growth are positive. Default risk remains low. If that's what you're putting forward, that seems to me to be pretty strong evidence on behalf of Triangle instead of you. Well, in counter, respectfully, Your Honor, what I would say is a lot of those statements relate to the lower middle market generally, which would include the Unitrans investments that were being made. With respect to mezzanine, there is a much bleaker picture painted throughout this document. There are statements, for the appendix, that these businesses are looking to take advantage of the market and have somebody overpay for their business. There is a statement on A220 that reflects deal quality saying, deal quality and lofty valuations are contributing to lower hit rates for sponsors and lenders. And then on page A234, there is a 2015 study by PNC in terms of lenders who say they still do mezzanine. Likewise, there are other statements on A222, A224, A229, A234, and A236, which reflect that the mezzanine market was not strong and the mezzanine lenders needed to proceed cautiously if they were going to proceed at all. But there are certainly differing opinions amongst, I'm sorry, go ahead, Judge Qualibaut. Counsel, on that point, I think it's fair to say there are comments in that report and around that the mezzanine market is what was changing and perhaps even getting more challenging. But it seems to me your inferences require that changes and even And why isn't it just as reasonable to infer that, yes, there are changes in the market, maybe it's more challenging, but there's still opportunities for successful investment within it. I don't see how, it seems to me like challenges equal inevitable failure under your theory, and I don't understand where that comes from. Your Honor, respectfully, we would disagree with that interpretation. We do not allege that these senior officials invested in poor investments with an aim to do the company. That is not what our inference is, that is not what we allege. What we are alleging here is that there was a substantial change in the market, and we know there was a substantial change in the market because the defendants say so themselves. And they were told that by their own investment personnel, and the industry, we believe, reflects that. So with the changes in the investment market that they were within, there was substantial risk, and they didn't disclose the substantial risk within the market. Not only did they not disclose it, not only did they not proceed cautiously like other mezzanine lenders were, but they went out and they poured record amount of capital into the market in an effort to preserve their dividend. Well, at that time, counsel, here's what they were saying on their Form 10-Ks. We invest in securities that are rated below investment grade if they are rated. Such securities are often referred to as high yield or junk. So that's in their 10-K that they've told the whole world, we invest in junk. If we're forced to match our competitors' pricing, et cetera, we may not be able to achieve acceptable returns on our investments, and may bear substantial risk of capital loss, and could force us to accept less attractive investment terms. That seems to be a pretty strong statement to the market. I mean, they're telling the whole world, we invest in junk. You know you're taking an exceptional risk if you invest there. That seems to be a pretty strong statement to the investment community. Well, there's two things that I would say in response, Your Honor. First is, the statement that they were investing in high yield is relative to the lower middle market, and these junk securities are, you're calling them high yield and junk relative to, you know, a grade A investment level. There is a relative risk within that given market. So there are going to be riskier investments that are high yield, and there are going to be better, safer investments that are high yield within that particular tranche of investments. And in this instance, Triangle was originally from 2010, 2011, 2012, dealing more in the higher end of the market. When the senior lenders came in, they were forced to go down below into the lower end of the lower middle market, and thus take on more risk because they refused to leave mezzanine lending. Then with respect to those disclosures that you outlined, those risk disclosures, they were all mere hypotheticals. They do not acknowledge that there were changes in the market. They do not alert the investor that the market had changed and these risks had materialized. And they had a duty to do that otherwise. They said that the market was, was, was inuring to their benefit. They said that the market was fruitful. And they said that the market was underserved, all of which is false. Isn't that sort of fundamental to the questions being asked? You're not talking about a specific fact, you're talking about a general market trend. And they were in the middle of it. Isn't that in fact, what you're talking about a general risk of a general market trend? Is that is that? Yes, yes. Yes, Your Honor, they are they are in the midst of a known market trend, where the senior lenders are coming into the market and scooping out the top quality investments within that sub market, and thus being pushed down into the lower level. And rather than adjust, they continue to pour record level in record levels of capital into the market at the lower level, thus changing the risk profile of their portfolio. But they didn't they didn't refuse to leave this mezzanine lending, right? I mean, instead, they did, to some extent, invest in this unit trace trench financing, only only later in the process, Your Honor, we would we would allege later in the class. So if I understand your theory, what you were saying is they didn't do enough. Your Honor, there are really two, there's really two separate. I'm not sure of how to say this is two separate timelines of what happens here. And what I think happens is, we have a first couple of years from 2014, up until February of 2000. Let's let's let's not get too deep into that. The general question I asked is straightforward. But But even if you show these generalized risk to the market trend, what about the Santa question here, you've mentioned all these inferences, what permits you to stack those inferences up to then be able to show Santa? Well, Your Honor, we respectfully would say that we're not stacking inferences here. And the the stacking inferences. Well, I haven't heard you mentioned anything but an inference. Well, Your Honor, respectfully, we have alleged actual statements from defendants own mouths, exhibiting their own actual knowledge. There's no inference that the court doesn't have to infer anything because the defendants say the inference, there is a risk. You have nothing directly to say that there is a risk other than the inference that derives from the statements that are being made in terms of the general market trend. Those are inferences. Yes, but we also have no specific fact here that's being set forth. You've already we've already agreed to that and it was the general market trend. So what you end up is you have inferences that are being stacked on inferences and the district court says that's not sufficient to allege Santa. Well, Your Honor, we would we would respectfully disagree with the idea that we have not shown that we're not not cited to direct statements that events actual knowledge that would be sufficient to show. Well, counsel, why don't you give us the best one or two of those statements that you say show Santa? What are the best ones for you? Best statements that exhibit the actual knowledge would be Mr. Poole's admission at the end of the class period that says in 2013, the market shifted. We were informed by our investment personnel to move away from mezzanine lending, and we did not do it. And the second would be Mr. Lilly's statements that one, there was a shift in the market. And then second, Mr. Lilly's statement that in 2014 and 2015, the company was chasing yield in order to preserve the dividend. So but that's I mean, we've asked you a lot of questions. So we'll give you a little extra time here. But I mean, how does that show see entered, though, it may show that there was some does that show in real time? See enters? We believe that it shows the answer, Your Honor, because they have the actual knowledge of what's going on. And if you look further, as I was mentioning to Judge win before, if you look at the in this first quarter, almost squashes all investment, the company invests in almost zero new investments. They come out with triangle 2.0 in June, which is which substantially redoes the company's the company's underwriting practices and monitoring. And then they implement the hedging strategy that Judge Witten hinted at, which was not disclosed up until defendants mentioned it in their reply brief on page 30 that they were hedging their bets and entering its unit ranch in an effort to alleviate some of the risk. Just just for my information. Do you characterize those statements that you alleged have been sufficient as forward looking statements or were they opinion statements? We don't believe they were either. Your Honor, we believe that they were statements of contemporaneous knowledge. Then you mean an opinion statement? No, Your Honor, we don't believe that their opinion statements. We believe that their statements. We don't believe in an opinion. You have a third category here that you're looking at that you say they're just statements of contemporary knowledge. Yes, but of what? Of the of the defendant's knowledge, actual knowledge of what was going on in the market. And that is, again, buttressed by the law and speak to what the falsity is. The falsity of their of their statements. Again, there are there are numerous statements that defendants make that are false. I want you to go back to Judge Agee's question. Tell me what they are. I've not gotten that yet. What is this statement that that is saying something which shows they know it is false? OK, well, there are those are two separate questions, Your Honor, at least as I'm understanding what you're asking. You're asking not in so far as not in so far as determine what Sienta is and your allegations of sufficiency of it. OK, well, as I'm understanding, your question is you're asking me what the false statement is. And then you're asking me also where the center comes from. And those are you answer those questions in two separate matters. The statements that events see answer are the statements that show their actual knowledge. And their actual knowledge is apparent based on their own admissions. They have inferences that draw from these statements. Again, that's what you're saying. Your Honor, I wouldn't refer to them as as inferences that need to be drawn. I would say that those are statements of actual fact that they're saying this is what we knew when we knew it. All right. Counsel on that point. If I'm understanding you, you're saying certain certain statements indicate Sienta by by reflecting the official's knowledge. It seems to me their knowledge would indicate whether or not the statements were true or not when made. But that doesn't necessarily equate to an intent to deceive. Your intent to deceive, I think, is limited to two pages. I forget one paragraph, 174 through 181. That is, I read them look almost like carbon copies of what this court said in Casarelli. Do not sufficiently allege see enter. Your Honor, and maybe we should stop. I know I'm going way past your time, too. I'm glad for you to deal with that and reply. But one of my concerns is, why don't you go ahead and answer that question now and then we'll move on. With respect to the intent, there are two things that I have to say here. First is when we allege actual knowledge, according to this decision, this court's decision in Zach, we don't need to show motive. Motive is not necessary. Now, with respect to intent, there is certainly intent here. And that, once again, comes from defendants' own mouths. Mr. Lilly says that there was an internal motive at the time to chase yield in order to preserve the dividends. They gave us what their intent was. They gave us what their motive was. All right. Thank you, Mr. Donovan. You've got some rebuttal time. Mr. Parrish. Yes, Your Honor. May it please the court, Ashley Parrish for Triangle and for the individual defendant. Plaintiffs have not met the demanding requirements for pleading securities fraud. They merely disagree with Triangle's business judgment or Judge Wynn, as your question suggested. They just think that Triangle did not do enough. What I thought I would do this morning in light of Your Honor's questions is three quick things. First, underline some of your questions relating to context, which plaintiffs repeatedly ignore. Second, address the only two statements they rely on for Sienta and help the court understand why neither of those are sufficient. And then I'll just say just a couple of words about their failure to identify a material fact. Would the lack of Sienta be sufficient in and of itself, even if you could show the other things, the misrepresentations or omissions? Yes, Your Honor, it would be. And is it particularly strong in this case to show that the lack of Sienta, that the complaint failed to adequately allege that? I think so, Your Honor. I think there was a little bit of a sort of embarrassment of riches here as to how the district court could have eliminated this case. But certainly the lack of Sienta is so glaring that that was a legitimate basis for the district court to dismiss. But if the district court had wanted to go into a deeper focus on the lack of a material statement, those two things reinforce each other and the court could have dismissed on those grounds, too. Counsel, if I could ask a question related to the relationship between the misrepresentations on the one hand and Sienta on the other. In our Casarelli case, it kind of illustrates what the Supreme Court has allowed, which is essentially a comparison of inferences. And there, the alternative inference was distinct, if you will, from the issue of the representation, whether it was false or not. The alternative inference was there were competitive reasons for it as opposed to something untoward. It seems to me here the alternative reason or alternative inference that you offer is pretty connected to the issue of whether there was a representation in the first place. And I don't know that that makes it problematic. It's just if you were to assume that the plaintiff has met its burden with respect to materiality, it seems odd that you would at the same time say that the opposite of that is a more compelling inference. I don't know if that's making sense. It's just that they're more connected here than Casarelli. And I guess my question is, does that matter? And if so, how? So, Your Honor, I don't think it matters. Let me see if I can answer your question a slightly different way and see if it's helpful. If I misunderstood it, please correct me. But one way to look at this is that if we were to assume that they had fled Skienter, which we don't obviously think they have, is there anything left to the materiality allegations that would go? And the way I would look at that, Your Honor, is that when you're relying on statements of opinion and you're making the argument that the statements of opinion are materially false, even if under Skienter you could overcome the reckless disregard, if in the context of materiality you can't show that there's actually disbelief, so it was reckless but it was done in good faith belief, those would still be two separate inquiries. And here they haven't fled that. So, Your Honor, another way of getting at your question, which I know you've led with materiality and there's different ways of looking at how those all go together, but I do think there is some daylight between a pure Skienter inquiry and a pure question of a material statement of false fact. But here they generally collapse down because there's no evidence that there was either reckless disregard or specific evidence going to actual knowledge. And therefore, it seems like the inquiries overlap significantly. Yeah, so it would seem at least odd to find plausible materiality but find a more compelling inference. But I think isn't there a preliminary issue before you compare competing inferences as to whether there's an adequate allegation of a strong inference? And if you don't have a strong enough inference, I'm not suggesting that's the answer here or not, but as a matter of theory, if you don't have a sufficiently strong inference, do you even get to the comparison? I think you're right, Your Honor. The way I look at it is to think about a scale, and the court starts off under Twombly saying it must be plausible. Sorry, possibility is not enough. Then you get to plausibility. Then you get to, in the context of securities fraud, cogent and compelling. And in order to get to cogent and compelling, which is a comparative, you actually have to show a strong inference. Judge, if I'm understanding where your question may be coming from, is that the other side has obviously emphasized that one line in the district court's decision that says there's sufficient facts to support a plausible inference. And the way we look at that, Your Honor, is that it's a little bit of an odd statement in the court's opinion because the next statement says that the judge also assumes. So it sounds like the judge is putting it in the context of making assumptions. But putting that aside, even if the judge were to have found that there's a plausible inference. Before you go there, I do want to make sure I understand correctly. When I read the judge's use of that term, plausible inference, I put it in the context of the misrepresentations and omissions, and that the strong inference was really more the standard that would apply to SIENTA. And that you could actually reach different conclusions as to misrepresentations and SIENTA because there were different standards, the plausible inference as opposed to the strong inference. Your Honor, I don't think that's how the court has analyzed. I think the court says that both the materially false statement and the SIENTA must be pled with particularity. The way we look at it, Your Honor, is that there might be plausible inferences out there before you consider whether they are strong or whether, in light of all the inferences, they're cogent and compelling. And I thought Judge Quattlebaum's question was going to this, which is that even if the district court was to say in passing and you gave it all the weight that plaintiffs want to give it, that there is a plausible inference, you still have to, for both materially falsity and for SIENTA, take the next step and say, is it a strong inference? And in light of a holistic understanding of the record, is it cogent and compelling? And, Your Honor, that's why your questions at the start were so important in terms of context, which is that, again, Judge Agee, you put your finger on it, right, which is that this is in the context of very high-risk, high-junk investments that everyone knew that there was a possibility of high yield but also a possibility of high risk. It is true that every investment was disclosed by Triangle, as well as the performance. And then, Judge Wynn, you had made the point, which is absolutely right, is that there were trends in the market, and some people looked at those trends and thought that the market was moving in a direction, but some people thought that there were still quality investments to be made. That is exactly what Triangle was. It was one of those people. It thought that even though the trend was going in one way, it had, for 10 years, bucked trends and made a lot of money for its investors doing it, and it thought that it could leverage its special relationships to doing that. And the problem with all of what plaintiff has said is it's all with hindsight bias. Again, Judge Wynn, as you aptly put it, that they didn't do enough, they could have done something differently, but that's not fraud. Your Honor, that takes me to the second thing, which is I do urge the court to look at scienter. The first thing is look at what is not a lesson. Counsel, before you leave at that point, just to make sure I understand part of your argument here, where the district court uses the term plausible inference in its section on material misrepresentation, is it your argument that for that section, should we address it at all, is that the district court used the wrong standard to find a material misrepresentation separate and apart from any consideration of scienter? Your Honor, just to be clear, we really are making three points, and none of them are quite that it's the wrong standard. The first point that we're making is that if you look at that statement in context, it's not clear what the district court is doing, because the district court later in the next sentence says it also assumes. And we think that puts a question as to whether the court was just doing a drive-by ruling there to get to what it said was significant. And that's important, but notwithstanding that, Your Honor, is that the second point is Judge Quattlebaum's point, which is that even if the court was to say that there's a plausible inference, that doesn't mean that there has been enough to satisfy the requirements for pleading a material statement, because you still have to put it through the question of whether that's a strong inference that it was materially false. I appreciate this clarification. I was kind of going in the direction of the district court on it and basically arising from the teacher's retirement system where they use reasonable belief insofar as misrepresentation. And reasonable belief is different from a strong inference, a strong inference being what I thought he was doing was applying that at the scienter stage, which to me made sense, that you only need a plausible inference insofar as the misrepresentations and omissions, but you've got to have both. You've got to have the scienter, which is a higher standard. But, you know, you seem to view it more of a mixed bag here in which, I don't know, you didn't directly say to Judge Agee he made a mistake, the district court made a mistake, but I don't quite understand his answer, because that's kind of the way either we overlook it, as you say, with the assuming part. And maybe that's the end of the day. It may not. It doesn't matter. If we could, we just assume, OK, the first part and say there's not Sienna. If that's the case, then, you know, maybe it's not as mixed as it sounds. Your Honor, if I'm if I'm confusing the court in any way, I apologize. No, you probably you're not. You're not confusing the court. You probably just me. I doubt that, Your Honor. But I will say that all I'm trying to point out is if for some reason you thought the district court was wrong on center, we still have an argument on material falsity. And that one line in the district court's opinion doesn't solve that question for you. But but your honor, I'm not in any way suggesting that. I think the district court did a very good job of analyzing these issues. And when you look at what happened in the center opinion portion of the opinion, you can just affirm on that ground on its own. And you'll also realize that what the judge said in the center portion of the opinion is very relevant to the fact that they can't identify a materially false statement. Because when we go through that in the briefing before you in this court, they still haven't identified a materially false statement. But again, I don't want to die on my sword because we win so easily on center. We just urge the court to affirm. Why don't you tell us about see enter now, Your Honor? Thank you. Yes. So if you what I was going to say first is that it's interesting that what they have not pleaded because we all see this in security fraud cases, contemporaneous documents. They haven't pledged that no confidential witness. There's not nothing like that. There's no underlining, clearly illegal misconduct that you sometimes see in cases that they rely on. And they haven't alleged a legally cognizable motive. It's no suspiciously fine stock sales, but nothing more than what you'd expect of any executive. So what is pleaded? Right. There's only two things. And they appear on pages 70 to 7 to 8 of their reply brief. The first is the November 2000 statement by Mr. Pool. And what they say, and this is on paragraph. I'm sorry, the J. A. 197 and 98 paragraph 160 of their complaint. He says that there's a massive change in the market. And some investment personnel warn Triangle to move away. Well, all he's doing, Judge Wynn, is talking about a trend in the market. He's not saying that we can't take advantage of that trend. He's just acknowledging that there is a change. It's all retrospective. And it's clear that he's making a hindsight observation. He says it's a strategic decision. And, Your Honor, I'll read from another paragraph that they don't include in the complaint, but from the same record exhibit. This is on R. 79, number 18. Triangle's history has been strong. And our difficult 2014 and 15 investment managers relate directly to a missed strategic call on the market some year ago. Where hindsight indicates clearly we should have moved in a specific direction at a specific time, and we did not. What his statements are saying is this is the new CEO of the company who's reflecting that. Counsel, tell us again. Where do we find that? Your Honor, that is on document 79-18 of the record. It's on page 5 of the PACER printout, Your Honor, or page 4 of 14 of the document. This is the printout of the Q3 2017 earnings call, which is what they rely on. All right, all right. It's not in the appendix. We have to go to the PACER document to find it. Your Honor, if you'd like us to submit that to you. You told us where to find it. That's good enough. And, Your Honor, I would just underscore that even taking on face value, this is just the Yates problem, right, which is that Yates makes clear that the fact that there are disagreements within a company does not mean that there's fraud. The fact that he says some personnel was recommending a different strategy doesn't get you there. So, Your Honor, that then takes us to the May 17 statement by Mr. Lilly. And, again, unfortunately, today counsel has again mischaracterized that. He talks about chasing yield, but it's important to, again, look at the actual quote. Now you can just look to their own complaint, J191 paragraph 143. And here's his quote. And if you look at the period of time and look at fair value within our book today, I think you would reasonably conclude that there was a period where Triangle was chasing yield more than it should have. Again, it's a retrospective look and saying, yes, we acknowledge in retrospect that at that time, you know, if we could go back and do it differently, we probably were not doing it right. But it's not an acknowledgment or admission that at the time there was something untoward going on. They were making a strategic decision at the time that they would be able to find opportunities in the market that others couldn't. Your Honor, that doesn't come close to raising a strong inference. And what we've just done in less than two minutes is go through their entire de-enter argument. That is all they present on pages seven to eight of their reply brief other than talking about how in our brief we talked about hedging. But, of course, that's the context that makes sense. That's it. Nothing else. Now, Your Honor, the reason why there's nothing else is because what they're trying to convince the court is that there is a showing of severe recklessness, which, as you know, means that must be an extreme departure from the ordinary standard of care. And in doing that, again, it's so important, Judge Agee, to go back to your point, which is that we already knew this was a very high risk investment. This is not like the out-of-circuit district court cases they rely on when someone's been told that we're making conservative investments and then behind the scenes they're shifting. So there appeared to have been an internal debate that was going on about this issue. Can we infer, see, enter from the fact that they didn't mention that? No, Your Honor, you cannot because I think the Yates decision is directly on point with that. In Yates, it was even clearer because there's a question of compliance with an objective accounting standard. And the court says the mere fact that there was debate within the company as to how to comply among the executive officers is not enough. Now, here, Your Honor, we're not even talking about a particularly identified facts of executive officers. We're talking about a earnings call where, looking backwards, he said there was some personnel that said a different strategy would be better. That's just a strategic decision that has to be made all the time. Yates says that's not sufficient. Your Honor, I think it might be helpful just to take a look at what are their arguments that would suggest, contrary to this, that there's recklessness. Counsel, if I could, I mean, if internal debate would constitute sin or that would be truly extraordinary, wouldn't it? I mean, what organization thinks in exactly the same terms about exactly the same issues? I mean, investment companies often have risk committees and they vote. And, I mean, I can't imagine lack of unanimity would equal sin or any investment that turned out bad that there was a possibility of it, a recognized possibility of it going bad would equal sin, wouldn't it? Your Honor, I agree completely, and you put it better than I should have put it that way. I completely agree with you. The mere fact that there's disagreement. In fact, we would like to encourage openness in retrospect. We want companies in retrospect to say we made a strategic decision to go one way and now we look at it and we're going a different way and here's why. But none of this is sufficient to give rise to meet the high level of fraud. And, Your Honors, you can see this in the cases. So if you take a look at their briefs, again, they rely on a lot of out-of-circuit cases that aren't even consistent with Fourth Circuit precedent. So they rely on that California case and it talks about how important it is, what the core objective of the company is. But this court has rejected that again in Yates. But they rely on the – in this court, they rely on the Singer case. And, of course, in Singer, what concerned the panel there over a dissent was that there was a real sign of, you know, quote, unquote, clearly illegal conduct. This case is nothing like that. There's no clearly illegal conduct. It really is just business judgment. And they rely heavily on Zach again over a dissent that says that the court has gone too far. But then we have objective facts that we have a situation where FDA is telling a company that you need to do studies and the company goes ahead and tells its investors that we don't need to do studies. You have FDA staff saying the drug won't be approved and they're telling their investors that the drug will be approved. Neither of that is – those show the outside, the dissents underscore that those are the outsides of security fraud. And here we're nowhere close to the best cases that they can cite in this circuit. And all the cases they cite out of the circuit either apply the wrong rules or they're easily distinguished. Your Honor, I don't think I need to go into more other than I would just say if you do decide to look at falsity, all I would say, Judge Wynn, is take a look at pages 28 to 29 of their reply brief. That's their attempt to identify a statement. The only statement they look at is that Mr. Poole states that, quote, triangle excelled in originating high-quality new investment opportunities. And that's their hook. It's not enough. Your Honor, the PLSRA does not allow securities fraud claims just because stipe prices drop. And with hindsight, plaintiffs would have done things differently if the district court properly dismissed this case, and we'd be grateful if this court affirmed it. Thank you, Mr. Parrish. Mr. Donovan, you've got some rebuttal time left. Okay. On the issue of fraud by hindsight, we don't think that that's applicable here. That's a very limited doctrine that only applies when a defendant says that something goes wrong and then a plaintiff believes or alleges that they must have known. In this instance, we have more allegations and better allegations than simply conclusory stating they must have known. They have admitted that they knew. They have admitted that they were informed. These men were all involved in the company's underwriting practices. They were all involved in the day-to-day functions of the company. They observed the shift in the market via Mr. Lilly's statement that 2013-2014, the prices shift. And it's just simply not fraud by hindsight. It cannot be dismissed on those grounds. The fraud by hindsight cases are extremely limited, and that's just a theory that doesn't hold water here. Now, with respect to the court asking me to identify statements, and, you know, again, I'm going to go back to the market. The market was fruitful. The market was underserved. And then in their 10-K, you have to remember that they signed the Sarbanes-Oxley certifications. They certify that the statement that the market was underserved and they had a competitive advantage is true. And that's contemporaneous with their knowledge that the market was not adhering to their benefit, that the market was flooded with capital from senior lenders coming in and scooping up the best opportunities and leaving them with what was at the bottom of the market, which was inherently more risky. Those statements are false. Now, I've heard reference to Cozzarelli a number of times, and I think that a lot of this court's decisions, be that the Singer dissent, Cozzarelli, McGuire, and Yates, there's a focus, there's a tendency for the Fourth Circuit to focus on intent. And in all of those cases, there is a very narrow gap that exists between what is true and what is false, in our opinion. And there's room for good faith to occupy and overcome intent. Here, what we allege is we allege that they're saying one thing, and then behind the closed doors, they know and believe another thing. So we have statements that they are investing prudently, that they're of conservative investments, that they're doing the A deals, not the B and C deals. And then behind closed doors, they're expressing a desire to chase yield, to preserve their dividend. So counsel, go ahead, Judge Wayne. I'll follow up. I didn't want you to leave without at least helping me understand a little better. The other side indicates this case of Zack, which is one of our recent cases, requires that you relate to a specific fact that wasn't disclosed. And I asked you earlier as to whether you were referring to general trends. And it would seem to me that a general trend is a little different than a specific fact, like in the case of Zack, where the specific drug is unlikely to be approved. So differentiate that for me, and let me know, do you agree that Zack sort of limits this to consideration of specific facts, or is it your argument that the general trend is sufficient? Your Honor, we would say that the general known trend in the market is sufficient. But here, we also have an adverse- But tell me the authority you're relying on for that. That's why I need to help you. Okay. I got the specific fact aspect of it, but I don't know of any that says a general trend is sufficient. According to Regulation SK, the company and its managers are supposed to disclose known trends in the market. That would be our authority. Okay. And with respect to your point about Zack, here, there was an adverse recommendation that came down. They had people within their own building say not that they had a couple of bad investments, not that they needed to ease off mezzanine investing. They said they needed to move away. And that is an incredibly powerful recommendation. These are- What makes that difficult for me to grasp? I'm thinking if you fail to disclose a general trend, the word general in and of itself tells you it's vague. And it lets you know it can go either way. What we notice, mezzanine financing is high risk from the beginning. I mean, that's the whole nature of it. I mean, if you want to make money, you've got to play with the big boys. You've got to take the big risks. And maybe that follows, but people do that. But when you're dealing just with a general trend, it seems to me you need to say something a little bit more than-well, a lot more than general trend. You need a point. They knew this specific fact of this event was going to happen, and yet they didn't act. As opposed to the market looks like it or there's some people seeing this. And then, as Judge Agee alluded to earlier, there was evidence to say people were staying with this mezzanine financing because they still found things that the equity aspect of it was attractive to them in some way. I mean, there's all kind of literature going back and forth on this thing, whereas, yeah, you look like most people are going in this unit transfer, but not everybody did it. But the general trend was going there. And that just doesn't sound like it's enough unless you have something more specific. Well, under Regulation SK, they have the duty to disclose the known trend in the market. And if the known trend in the market was that the better opportunities were going to more senior lenders and mezzanine was being left with lower quality opportunities, which is what we believe the BGL report lays out, that's a known trend. And they have a duty to disclose that regardless of whether they believe they can still find quality opportunities or not. Just for my information, maybe I'm trying to understand, is there a scenario that it could have gone the other way? Your Honor, anything is possible. I understand that, particularly when you're dealing in the market, believe me. All right, go ahead. Yes. I mean, certainly there is a possibility that their risky investments, their risky bets may have paid off. You know, there's no denying that. But that's not what this case is about. This is about the fact that they loaded their portfolio up with risky investments knowingly and had represented to the market, one, that they had a competitive advantage and the market was underserved, which they certified to under Sarbanes-Oxley. And then by loading their portfolio up with risk, they never disclosed how poor those opportunities were and how high risk they were. So the market didn't adhere to their benefit, and they had misled their investors. Judge Quattlebaum, you had a question at one point. Did that go away? Yeah, I got what I need. Thank you. All right, all right. Well, thank you very much to both counsel. We appreciate your excellent arguments in this case. As you know, ordinarily in the Fourth Circuit, we would come down and shake hands at the end. We can't do that now, so if you'll just consider this your virtual handshake, and we hope you can return when life returns to some semblance of normal so we can engage in our normal acts of civility. So with that, I'll ask the clerk to adjourn court, and if the judges will stay on, we'll conference once all that's taken care of. Thank you very much, Your Honors. Thank you, Your Honors. Thank you. This honorable court stands adjourned.
judges: G. Steven Agee, James A. Wynn Jr., A. Marvin Quattlebaum Jr.